The desire expressed by the counsel on both sides, for an immediate decision of this case, has obliged the Court to present the results to which it has come, rather than an extended opinion, on the question submitted to its consideration.
We are of opinion that the wine in question was sold in violation of a regulation of the city of Providence, prohibitory to a certain extent, adopted by force of a resolution of the freemen thereof, pursuant to the acts of January and June, 1838, relating to the licensing of the sale of wine and strong liquors. These acts are essentially prohibitory or restrictive. The power to grant licenses arises out of their prohibitory or restrictive character; and inasmuch as all regulations of trade are in some sense restraints upon it, this feature in those acts cannot be pronounced void, without at the same time its being in effect declared that every State regulation touching its internal trade is also void. Whether these acts be *Page 294 
or be not constitutional, must be determined by considering the authority in which they originated, and their object and effect.
It is undoubtedly the object of these acts, and the regulations adopted in pursuance of them, to aid the police in the several towns and of the city of Providence, in the preservation of good order, and in the prevention of pauperism.
The history of the license system from 1648 to the act of June last, no less than the examination of the acts themselves, and especially the acts under consideration, clearly show that such was their leading, and in the case before us, the exclusive object.
A power to pass laws, and adopt police regulations for the preservation of good order, and the prevention of vice and pauperism, is absolutely necessary to the existence of the State and of every well ordered community. Power to pass laws to this end belongs to the State exclusively. It belongs exclusively to the State by its Legislature to provide for the punishment of disorder within its limits, and also to the State exclusively to enact laws for its prevention. This power cannot be surrendered without self annihilation.
This power is one which may be exercised when necessary, (and the Legislature is the only judge of that necessity,) upon all objects that fall within the sphere of State legislation, and which are beyond the constitutional limits of the legislation of the general government. Within this sphere it may impose restraints and regulations on any pursuits, trades, or occupations — they being in a strictly constitutional sense, the domestic or internal pursuits, trades, and occupations of the State. *Page 295 
The constitutional provisions on which the counsel for the defendant rely, are those which forbid any State to impose duties upon imports, and which give to Congress the exclusive power to regulate commerce with foreign nations, and among the States. Do the restraints imposed under the authority of these acts, trench on these provisions? Do they assume to impose a duty on imports, or to regulate foreign commerce or commerce among the States?
They do not assume to impose a duty on imports, unless the term import, in its constitutional sense, means any article imported, wheresoever it may be found, up to the point of consumption. Such cannot be the meaning. The term import has a meaning of like universal application with the term export. Those terms do not signify the mere article itself, but the articles considered in connexion with a certain condition, as having certain destinations, inward or outward, and it is its particular destination which gives it its denomination. An import may become an export, and an export an import, on the same day, and in the same hands. Moreover:
An article of foreign commerce cannot be an import up to the point of consumption, in a constitutional sense: because if it be so, it must still continue subject, as at the moment of its introduction, to the exclusive commercial regulations of the general government, and may be followed by those regulations with all the officers necessary for enforcing them, and to the exclusion of State legislation, from hand to hand through all its transfers and divisions, up to its entire consumption. Again — if such be its meaning, then by parity of reasoning it may be shown that the same doctrine would apply to all articles of the growth and products of the several States, *Page 296 
which are or may be articles of commerce among the States — the power to regulate the commerce of the United States being a unit, and being as exclusively in the general government, in the one case as in the other. Upon this hypothesis, this overshadowing and engrossing power would come in contact with State legislation everywhere, and everywhere triumphing as the supreme law of the land, leave little to the legislation of the State, except crime and pauperism, and small resources, indeed, to sustain it in its action over these. No court has yet given this interpretation to the constitution, and certainly, as the supreme judicial power of the State, it is not felt to be the particular duty of this tribunal to be the first to adopt such suicidal construction.
An import then ceases, in the constitutional sense, to be an import, the moment the importer becomes the vender, and sells the article disengaged from the commercial regulations of the United States. In the hands of the retailer or distributor, it is an article of the internal trade and commerce of the State — a trade or commerce which none but State legislation can protect or regulate, and which necessarily falls peculiarly under the police of every community. Any tax or restraint, therefore, imposed for police purposes, upon the seller of wines and strong liquors within the State, can by no construction be deemed a duty upon imports, or a regulation of the commerce of the United States, unless a tax upon a warehouse be a duty upon imports, and a license to a drayman a regulation of the commerce of the Union. We cannot, therefore, consider the acts as a contravention of either of the articles of the constitution upon which the defendant's counsel rely.
But as to the French treaty. Without stopping to inquire *Page 297 
whether it be or be not constitutional, we may safely conclude, that although the government of the United States binds itself to admit the wines of France, at a stipulated duty, to be imported for consumption, yet it cannot be admitted that either of the contracting parties supposed that the United States were bound to provide for the consumption of all the wine that should be so imported, or that the several States were bound so to modify their police regulations as to admit it to consumption without restraint or regulation. Such could not have been the intention or expectation of either party.
We are therefore of opinion that the aforesaid acts are not inconsistent with the constitution of the United States, or any of the provisions thereof, or with any treaty made by authority of the same; but that (without meaning to intimate any opinion as to their expediency or inexpediency) the said acts are constitutional, and the binding law of the land.
Judgment must therefore be for the State. *Page 298 
This is a blank page. *Page 299 
 SUPPLEMENT.
IN conformity with a resolution of the General Assembly at its June session, 1854, the following OPINION OF THE SUPREME COURT upon the act passed by the General Assembly at its January session, 1854, reversing and annulling the judgment against Thomas W. Dorr, is here inserted. The act of January is found in Public Laws, p. 1037, et seq.; and the resolution of June in same, p. 1091.
To the Honorable the Senate and the Honorable the House of Representatives:
WE, the Justices of the Supreme Court, have been furnished with a joint resolution of the two Houses, of which the following is a copy:
"Resolved, That the Justices of the Supreme Court be requested to furnish the General Assembly with their opinion upon the constitutionality of an act entitled `An act to reverse and annul the judgment of the Supreme Court of Rhode-Island for treason, rendered against Thomas W. Dorr, June 25th, A.D. 1844.'"
In compliance with said resolution, we have given a careful consideration to the act referred to, to the several provisions of the Constitution which bear upon the question submitted to us, and to those provisions of it which are referred to in the preamble of said act as authorizing the General Assembly to pass the same. *Page 300 
The act in question is an exercise by the General Assembly of supreme judicial power. It purports to repeal, annul and reverse a judgment of the highest Court known to the Constitution, and to declare it to be in all respects as if it had never been rendered.
The question on which our opinion is requested is, whether, under the provisions of the Constitution, the General Assembly can, by a final judgment of their own, rightfully reverse and annul the judgment of the Supreme Court.
The Constitution of this State, (art. III,) like the Constitutions of all the States, and of the United States, declares that
"The powers of the government shall be distributed into three departments, the legislative, executive and judicial."
To effect this distribution, the Constitution (art. IV, sec. 2,) declares that
"The legislative power under this Constitution shall be vested in two Houses; the one to be called the Senate, the other the House of Representatives, and both together the General Assembly."
And further declares (art. X, sec. 1,) that
"The judicial power of the State shall be vested in one Supreme Court, and in such inferior Courts as the General Assembly may from time to time ordain and establish."
These provisions of the Constitution create two separate and distinct, but coordinate, departments of the government, the one vested with the legislative, the other with the judicial power of the State. Each is vested with exclusive power in its appropriate sphere.
Upon the General Assembly is conferred the exclusive power of enacting laws. Upon the Supreme Court and the Courts inferior thereto, to be created by the *Page 301 
General Assembly, is conferred the exclusive judicial power. The power exclusively conferred upon the one department is by necessary implication, denied to the other. The Court, therefore, cannot enact laws. Their power is to judge and determine, to declare what the law at any time is, not what it ought to be or shall be. For the same reason the General Assembly cannot rightfully exercise the judicial power. That is conferred upon the Courts, and necessarily prohibited to the General Assembly.
The union of all the powers of government in the same hands is but the definition of a despotism. To guard against such a government was one great object of the Constitution. This was to be done by this distribution of powers. This is the great principle of American liberty. The rights, the property, and the liberties of the people, depend upon the due observance by each department of the constitutional limitations and restrictions upon its authority.
The exercise, by the General Assembly, of the power to reverse the judgments of the Courts, is inconsistent with this distribution of powers, and with the existence of a distinct judicial department.
It is necessary to the existence of such department that it should have the substance of judicial power, the effective controlling power. This is vital to it. When once made subordinate, its independent existence ceases, and it becomes merged in and part of the department which controls. It would be quite idle to vest in the General Assembly the legislative power, if, when they had enacted a law, it might be repealed by another body against their will.
But again, by the tenth article, the judicial power is declared to be vested in the Courts, viz: One Supreme *Page 302 
Court and such inferior Courts as the General Assembly may from time to time ordain and establish. The General Assembly are authorized to establish Courts inferior to the Supreme Court, but not superior. They are as much restrained from establishing a Court with power to reverse or overrule the decisions of the Supreme Court, as if they had been expressly prohibited. Yet, in so establishing such Court, they might preserve the legislative and judicial departments distinct.
For much stronger reasons are they prohibited from assuming to themselves the power of reversal, because they thereby not only constitute themselves such superior Court as is denied them to establish, but also thereby unite with their legislative powers those powers of the judiciary department, which are essential and vital to its existence.
It is the duty of the judiciary in all free constitutional governments to decide upon the constitutionality of laws passed by the legislature, and its decisions are final and conclusive.
The judiciary of this State is invested with these powers. Suppose the Court should decide an act to be unconstitutional, the General Assembly may reverse the decision, and by a final judgment of their own, affirm the constitutionality of the act beyond redress. This would destroy all the safeguards intended to be secured by a distribution of powers into distinct departments.
The fact that the State is a party to a judgment does not confer upon the General Assembly any judicial power over it. As party they may have the same power over a judgment that any other party has. They may remit a penalty, commute punishment, or pardon. They may release a judgment in a civil suit, or acknowledge *Page 303 
satisfaction. But this gives no power to reverse the judgment. It is simply a power to release or surrender the right which the judgment gives or decides to be theirs.
Neither are we able to perceive how the provision contained in the third section of article XIV, declaring that "the Supreme Court under the Constitution shall have the same jurisdiction as the present Supreme Judicial Court," can confer any judicial power.
By the tenth article, the Courts are to have "such jurisdiction as may from time to time be prescribed by law." The General Assembly may take from the Court some of the subjects of its judicial action; but this does not confer the right to transfer the judicial power itself from the judicial department. The number of subjects within the sphere of action may be less, but the sphere itself of its action cannot be changed. The power, therefore, to enlarge or diminish the jurisdiction of the Court could not authorize a reversal of a judgment in a cause within its jurisdiction.
And it may be proper in this connection to remark, that the indictment on which the judgment purporting to be reversed by the act was rendered, was found by the grand jury in the Supreme Judicial Court before the adoption of this Constitution — that Court then having, by law, the exclusive jurisdiction of the offence charged therein, and by the other provision of the third section, it passed to the like exclusive jurisdiction of the Supreme Court under the Constitution. And that the act giving such exclusive jurisdiction has never been repealed.
If the question therefore depended on these provisions only of the Constitution, we do not see that any judicial power is conferred on the General Assembly. *Page 304 
Is this view of the subject affected by the tenth section? That section is as follows:
"The General Assembly shall continue to exercise the powers they have heretofore exercised, unless prohibited in this Constitution."
Taking the language of this section in connection with the provisions of the Constitution to which we have adverted, independent of the practice of the General Assembly since the adoption of the Constitution, we should say it was not intended to confer judicial power.
The section is found in that part of the Constitution which treats of the legislative power, and confers it on the General Assembly. When, therefore, it speaks of conferring power on that body, the fair presumption is, that it intends legislative power, unless a different intent is expressed. If so extraordinary a grant was intended as of judicial power, that term would naturally have been used.
And this view of the section is confirmed by that part of it which limits the powers granted by it to such as are not prohibited in the Constitution. Now all judicial power, as we have seen, is prohibited to the General Assembly, by implication, it is true — but the prohibition is as strong as if it were expressed.
To construe the section, therefore, as conferring judicial power, would bring its two points in direct conflict with each other, and render the whole nugatory; for as all judicial power is prohibited to the General Assembly by the other provisions of the Constitution, none would be conferred by this section.
We think, too, it would be unreasonable to suppose the Constitution intended by this section to unite in one body legislative and judicial power, after having in the *Page 305 
previous provisions vested these powers in different bodies; more especially when we recollect that the distribution of these powers is declared by the Constitution to be its fundamental principle, and all admit such distribution is indispensable to freedom; whereas the union of the two powers in the same body is dangerous, if not fatal to it.
But the practice of the General Assembly since the adoption of the Constitution has not been in conformity to these views of their constitutional powers. They have granted petitions for new trial in suits at law — the new trial to be had in the proper Court — they have heard and decided appeals from the judgments of the Supreme Court on insolvent petitions, and in this class of cases the judgment of the General Assembly was final.
Undoubtedly this practice of the General Assembly since the adoption of the Constitution, being a continuation of a similar practice which prevailed down to that time, was supposed to be authorized by this section; and we do not mean to intimate the slightest doubt of the validity of these proceedings. But it will be seen they are such as involved powers which the General Assembly were in the practice of exercising down to the time of the adoption of the Constitution and subsequent thereto. The previous practice of the General Assembly to exercise a particular judicial power, although continued down to the adoption of the Constitution, is not, in our judgment, alone sufficient to authorize its exercise now.
If the power has been discontinued since the adoption of the Constitution, and its exercise is inconsistent with the provisions of that instrument, we are bound to suppose *Page 306 
it was discontinued on account of such inconsistency.
But if the practice prevailed before and after, and has been acquiesced in by the people, we do not mean to say such practice may not be valid upon the ground of construction by acquiescence and the danger to titles from now disturbing it. And when we recollect that every judicial power conferred by such a construction is in conflict with the fundamental principle and leading provisions of the Constitution, as well as with the last part of the same section, we think it must be considered sufficiently liberal in favor of the power. Certainly the exercise of judicial power by a legislative body is not to be extended by construction.
The question then is, were the General Assembly, at the time the Constitution was adopted, and have they been, since that time, in the practice of reversing and annulling the judgments of the Supreme Court by a final judgment, with or without the forms of law, in cases like the present?
Before and after the adoption of the Constitution, they were in the habit of entertaining petitions for new trial; but the new trial, if granted, was before the Court in which the suit was pending, and not the General Assembly; and among the first laws passed after the organization of the government under the new Constitution, was "an act directing the method of preferring petitions to the General Assembly and of acting thereon."
So, under a general law, they heard appeals from the Supreme Court on petitions for the benefit of the insolvent act, and affirmed or reversed the judgment of the Supreme Court in such cases by a final judgment. This power also continued to be exercised for some years after *Page 307 
the adoption of the Constitution; and this is believed to be the only class of cases in which they reversed a final judgment.
But this jurisdiction is no precedent to reverse and annul, by a final judgment, a judgment of the Supreme Court on an indictment for an offence exclusively within the jurisdiction of such court. The precedent which is to authorize a legislative body to exercise judicial power, should be directly in point, and as broad as the power claimed under it. The power to hear a petition for new trial — such trial to be had in the court in which the case is pending, is no precedent for an authority in the General Assembly to try the case on its merits, and render a final judgment thereon, reversing or affirming the judgment of the court in which the suit was pending. Still less is it a precedent for an authority by final judgment to reverse and annul a judgment of the Supreme Court, without the case being brought before them by petition for new trial, or appeal, or writ of error, or in any other known mode by which the judgment of a court below is reversed by a higher court.
So the hearing and deciding appeals from the Supreme Court, on insolvent petitions, is no precedent for a general jurisdiction in the General Assembly over suits at law, civil or criminal, to annul and reverse the judgments and decrees of the Supreme or other Courts in which such suits are pending, by a final decree and judgment.
So a precedent in which a judgment of the Supreme Court was reversed and annulled in a civil suit, is no precedent for such a proceeding in a criminal suit; and the precedent of a criminal suit is no precedent for a civil suit; so a precedent in an equity suit is no precedent at law, and the reverse. *Page 308 
The exercise of judicial power by the legislative department of the government is so inconsistent with the other provisions of the Constitution, and with the fundamental principle of all constitutional liberty, that the claim to exercise it on the ground of previous practice should not be carried beyond the precise precedents.
But we do not find a single instance in which the General Assembly, since the adoption of the Constitution, have reversed and annulled the judgment of the Supreme Court in any suit, civil or criminal, at law or in equity, by a final judgment. Still less do we find any practice of this kind has prevailed.
If the practice of the General Assembly, down to the adoption of the Constitution, had been to exercise such a jurisdiction, and such practice has been discontinued since, it is fair to presume it was discontinued because inconsistent with that instrument. But we think no such practice prevailed at the time the Constitution was adopted, or for a long period previous thereto.
Even assuming that the exercise of a power before the adoption of the Constitution, though discontinued afterwards, would be sufficient, we think, such exercise should have been habitual and usual, so much so as to have been well known and understood, and continued down to the time of the adoption of the Constitution.
The section was hardly intended to continue to the General Assembly all the judicial powers which at any period of our history may have been exercised by that body.
At an early period they sat as a court of appeals, and did regularly hear and determine.
But as early as 1713 they doubted "their jurisdiction or authority for the trial and determination of appeals from the Court of Trials." *Page 309 
They then resolved that, although the charter gave them very ample powers to make laws and constitute courts of judicature, yet that they had not the power to constitute themselves a Court, on the ground that they could find no precedent that Parliament, after passing an act or law, had assumed to constitute itself a Court to adjudicate thereon; and the Assembly thereupon repealed the law constituting themselves a Court.
And for half a century before the adoption of the Constitution, the jurisdiction of the General Assembly to try and finally decide suits at law, by appeal or otherwise, was abandoned.
We do not think this section was intended to revive it.
We do not mean to say there may not be found, during the period referred to, isolated cases, clearly novel and extraordinary, in which the General Assembly have reversed and annulled by a final judgment the judgments of the Supreme Court in suits at law. Whether this be so, can only be ascertained by carefully searching the records.
But if such extraordinary precedents could be found, we do not think this section was intended to revive them.
In our inquiries we have been met by the fact that the General Assembly had, before the adoption of the Constitution, exercised almost all the powers of government, and very many other than judicial, and which fall equally within the words, "the powers heretofore exercised."
They had, upon the happening of a vacancy in the office of Governor, without submitting it to the people, filled it by an election made by themselves. So with vacancies in the office of Lieutenant Governor, and of Secretary of State or Assistants. For filling such vacancies the Constitution (articles VI and VIII) expressly provides. *Page 310 
They had at different times prescribed the qualifications of electors. This was designed to be defined and settled by article II, beyond the action of the General Assembly.
They had prescribed the tenure of all offices except those of members of the General Assembly. This is limited as to certain officers by article VII and X.
They prescribed by law the times and places of holding the sessions of the General Assembly. This also is limited by article IV, section 3.
These are a few of the many instances of the exercise of powers by the General Assembly which are now prohibited by necessary implication, but not in express terms. The first above referred to, though for a long time usual and habitual, had been long discontinued. The others had been continued down to the adoption of the Constitution.
If the fact alone, that powers had been at any time theretofore exercised, would warrant the exercise now, then vacancies in office may be filled in other modes than those which the Constitution requires.
If the fact alone, that the exercise of a power had been continued down to the adoption of the Constitution, though then discontinued, would authorize its exercise by the General Assembly now, then the elective franchise may not be beyond the power of the General Assembly, nor the tenure of those offices fixed by the Constitution, nor the time and place of the sessions of the General Assembly, fixed also by the Constitution.
The reasons which have led us to the conclusion that the General Assembly have no constitutional authority to reverse and annul a judgment of the Supreme Court, apply with equal force against their authority to order the *Page 311 
reversal of the judgment to be written on the face of the record thereof.
This is a mutilation of the record — an act which neither the Court nor the General Assembly, before or since the adoption of the Constitution, had or have authority to do or to order to be done.
If a judgment be reversed, the reversal is recorded, but the record of the original judgment remains undefaced; and this course of proceeding is indispensable to the safety of parties who have a direct interest in the preservation of the records without mutilation or alteration.
In conclusion, we are obliged to say, therefore, that in our opinion the act referred to in the resolution is unconstitutional.
It is proper for us to add that if this judgment had been in force and could be executed on the defendant when the act referred to was passed, we should doubt the propriety of giving an opinion upon the constitutionality of an act to reverse and annul it. But the defendant had, before the passage of the act referred to, been released from imprisonment on the judgment, and restored to all his civil and political rights and privileges, and the judgment could not be enforced in any way against him. In this state of the case we have felt it our duty to give our opinion in answer to the question propounded by the two Houses.
 R.W. GREENE, LEVI HAILE, WM. R. STAPLES, GEO. A. BRAYTON.
JUNE 14TH, 1854.
[In a note to Arnold v. Leland et al. (2 Peters' Sup. C. Rep. 627) will be found an interesting synopsis of judicial and quasi-judicial acts of the General Assembly under the Charter of Charles II.] — REPORTER.
 *Page 1